IVAN C. JEN (SBN 252885)
Law Office of Ivan C. Jen
5820 California Street
San Francisco, CA 94121
Telephone: (415) 504-2706
Facsimile: (415) 449-6110
Email: ivan@icjenlaw.com

Proposed Attorney for the Debtor

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 15-31529 |
| | ) | |
| **Sinbad's Pier II, Inc.,** | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Judge: Hon. Hannah L. Blumenstiel |
| | ) | Date: [Subject to Order Setting Hearing] |
| | ) | Time: |
| | ) | Courtroom: 235 Pine Street, 23rd Floor |
| | ) | San Francisco, CA 94104 |

### MOTION FOR INTERIM AND FINAL ORDERS
### (I) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363 AND
### (II) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(b)

**TO THE HONORABLE HANNAH L. BLUMENSTIEL, UNITED STATES BANKRUPTCY JUDGE:**

Sinbad's Pier II, Inc., the debtor and debtor-in-possession in the above Chapter 11 case (the "Debtor" or "Sinbad's"), hereby brings this MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363 AND (II) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(b) (the "Motion"). The Motion requests interim authority for the Debtor to use cash collateral until a final hearing on the use of cash collateral may take place. In support of the Motion is the DECLARATION OF DUANE STINSON IN SUPPORT OF FIRST DAY MOTIONS ("Stinson Declaration") filed concurrently herewith.

Case: 15-31259   Doc# 6   Filed: 10/15/15   Entered: 10/15/15 14:45:02   Page 1 of 8

# I. Summary of Cash Collateral

1.     The Debtor proposes to use cash collateral generated from its restaurant operations. Cash generated would pay for ordinary business expenses. A proposed 90 day budget is attached as **Exhibit "A"** to the Stinson Declaration.

2.     The Debtor has identified through a UCC search two creditors with potential cash collateral claims, Sa-Ro Leasing and US Foods. The Debtor proposes to continue paying them in the ordinary course of business in the amount of approximately $1,280 a month to Sa-Ro Leasing and approximately $3,400 per week to US Foods. Both are on ordinary business terms. Through the use of cash collateral over the next 90 days, the Debtor seeks to generate at least $40,000 for creditors.

# II. Background

## A. Litigation Background.

3.     The Debtor is a seafood restaurant that does business under the name of Sinbad's. Sinbad's has been operating at Pier 2 for over 40 years.

4.     Sinbad's had a 20 year lease that ended in 2000. Since then, Sinbad's and the Port Authority, which is a subdivision of the City and County of San Francisco (the "Port Authority") have been unable to reach a new long term lease.

5.     In March 2015, the Debtor filed a lawsuit against the Port Authority, alleging the Port Authority acted in bad faith in refusing to allow the Debtor to continue operations until such time as Pier 2 would be demolished, case CGC-15-544849 ("Bad Faith Case"). The Debtor sought declaratory relief[1] to prevent eviction until such time as the location would be needed under the Bay Area Water Emergency Transportation Authority ("WETA") project. The WETA project was delayed from 2015 to 2016. In this case, the Port Authority filed a cross-complaint for indemnity and added alter-ego claims against the Debtor's two directors, Thomas and Duane Stinson.

6.     In April 2015, the Port Authority began unlawful detainer proceedings against the Debtor, case CUD-15-652204 (the "UD Case").

---

[1] The Debtor reserves its right to amend the complaint to add additional related causes of action and damages.

7.      The UD Case went to trial prior to the Bad Faith Case, where a judgment was entered against the Debtor for possession and damages.  The Sheriff's Department was prepared to take possession of Pier 2 on October 14, 2015.  Consequently, the Debtor filed for relief under this chapter on October 14, 2015 to preserve the status quo and avoid mooting the Bad Faith Case.

**B.      Operations and Financing.**

8.      Sinbad's is a full scale restaurant operating out of Pier 2 that employs around 35 employees.  As set forth in the Stinson Declaration, the Debtor estimates that it will be grossing around $145,000 for the next 30 day period.  While portions of November will be slower due to Thanksgiving, business will pick up in December with the scheduling of various holiday events.  Based on the Debtor's estimates, each subsequent 30 day period will generate at least $170,000.  If the case continues through February, the Debtor would also be able to pick up business from both Valentine's Day and the Super Bowl.  As projected, the Debtor estimates it could generate a net profit before taxes of at least $40,000.

**C.      UCC Search Results.**

9.      The Debtor did a UCC search for all liens against Sinbad's.  Five current liens[2] under Sinbad's name turned up: the IRS, US Foods, Sa-Ro, Rhino Services, and Rewards Network.

10.      The IRS filed a tax lien in September 2015 for 2014 related taxes.  The total amount is $71,522.18.

11.      US Foods, Inc. is one of Sinbad's major food suppliers.  A UCC was filed on June 11, 2014, which includes a Purchase Money Security Interest in the goods they deliver as well as a general lien on the Debtor's other goods, inventory, equipment, fixtures, and their proceeds.  The account is generally current under ordinary business practices.  Sinbad's pays invoices about

---

[2] The Debtor borrowed funds from Can Collect, and the agreement provides for both a UCC lien and a personal guarantee.  The Debtor's counsel spoke with Can Collect, who provided a UCC lien number.  The Debtor found a UCC lien for Minglewood Services, which the Debtor assumes to be affiliated with Can Collect.  The UCC filing was filed in February 2005, renewed in 2010, but not in 2015.  Under California Commercial Code 9515(c), the filing has lapsed, and they no longer have a perfected security interest.

30 days after they are due and runs an average balance of $14,000. Generally, a check for about $3,400 is paid each week as products are delivered.

12.     Sa-Ro Leasing, Inc. is an equipment financing company. In May 2014, Sa-Ro leased to the Debtor $38,000 worth of equipment and improvements. A UCC was filed on June 11, 2014, and the account is also personally guaranteed by both Thomas and Duane Stinson. Payment terms were $1,280.37 per month for 36 months. The account is current.

13.     Rhino Services had a UCC filing on September 4, 2012. The Debtor has no idea who they are. The Debtor's counsel called Rhino Services and left a message for more information. From what counsel has learned, "Rhino Services" is an industrial and environmental cleaning contractor and are otherwise not involved with the Debtor. Under these circumstances, the Debtor is not providing for them under this cash collateral motion.

14.     Rewards Network Establishment Services Inc. ("Rewards Network") is a financing company. The Debtor's counsel contacted Rewards Network and confirmed with their analyst that this account appears to be closed, and, barring some unusual circumstances upon review, a UCC-3 release is being processed. Therefore, no treatment is being proposed for them.

15.     The Court has jurisdiction over these maters pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(M). The statutory predicates for relief sought herein are 11 U.S.C. §§ 363, 1107(a), and 1108. Venue is proper pursuant to 28 U.S.C. § 1408.

### III.  Argument

16.     Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorize such use in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). The Debtor requires the use of cash collateral to continue business operations and make payments to its secured lenders.

### Interim Approval of Use of Cash Collateral

17.     Under Federal Rules of Bankruptcy Procedure ("Rule") 4001(b)(2), the court may not commence a final hearing on the use of cash collateral earlier than 14 days from service of

the motion.  However, the court may conduct a preliminary hearing before such 14 day period expires, and only on the amount that is necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

18.     The Debtor is requesting interim approval of the proposed cash collateral budget to avoid immediate and irreparable harm prior to a final hearing.  The proposed payments and explanations are as follows:

a.     Rent – The Debtor intends to pay post-petition rent as the Port Authority would otherwise have an administrative rent claim.  The daily rental charge is $730.78[3].  The Debtor proposes to make weekly payments in arrears on Fridays, starting October 23 (first payment would be $6,577.02 for 10/14 through 10/22).

b.     Trade Vendors – The Debtor requires constant deliveries of fresh foods, beverages, and other perishables in order to maintain its bar and restaurant.  These items in turn are sold and generate revenue for the Debtor.  Vendors would be paid for their post-petition deliveries.  The Debtor estimates total costs (excluding US Foods) at $21,000 on a monthly basis.  Payment upon delivery is likely required as they are unlikely to deliver on estate credit.  Because these items are quickly resold through the restaurant, continued payment of vendors as they deliver goods is essential to operations.

c.     Service Vendors – In addition to food, the Debtor has several vendors that are essential to operations.  Linen service and janitorial service are required to keep appearances sanitary and clean.  The total costs are about $3,500 a month.  Separately, and perhaps most importantly, the Debtor needs its credit card processors.  The Debtor's business is 90% credit cards.  The processors take a percentage of sales and average about $5,000 per month, which is typically drawn at the beginning of the month.  Disruptions in credit card processing[4] could be fatal to such a credit-dependent business.

d.     Utilities – Utility service includes water, garbage, electricity, and cable television.  The Debtor, but for the filing, is generally current on utilities.  All of them are

---

[3] Pursuant to their declaration of daily rental value in the Unlawful Detainer case.
[4] A separate Motion for Order Authorizing Debtor to (I) Continue Certain Consumer Practices and (II) Maintain Its Credit Card Payment System will be filed concurrently with these motions.

necessary to operate the Debtor's business. While it is unlikely the utilities will shut off the Debtor's utility service (in part due to section 366), maintaining utility service and paying for post-petition service is essential to business operations.

      e.    Personnel (Payroll) – The Debtor employs around 35 employees. The employees' wages have been prepaid through October 15. After that, the Debtor needs to be able to make post-petition payments for employee wages. Other than a complete cessation of business, the Debtor does not anticipate a reduction in its workforce. Wages and related taxes are approximately $32,000 per month. An additional $3,000 is paid each month for medical insurance as part of union agreements. Separately, the Debtor has a bookkeeper (Faye Huang) whose role is to compile the daily receipts, invoices, and expenses. Given the amount of paperwork involved in the business, her services are vital to assist in tracking expenses. The bookkeeper receives two payments of $850 a month. The Stinson brothers (Thomas, Duane, and Charles) manage the day-to-day operations and operate the front desk. Each work about five to six days a week and each work about 50 hours weekly. Compensation has been off-and-on, depending on the state of the business. Otherwise, they generally receive $2,000 twice a month. For purposes of this reorganization, they are prepared to reduce their payments to $1,000 for the first month to ensure profitability for the estate. Afterwards, they are seeking $3,000 per month to cover the anticipated extra hours for the busier holiday season.

      f.    Secured Payments (US Foods) – The Debtor seeks to pay roughly $13,000 per month to US Foods, which represents the amount of product that they deliver on a monthly basis. Payments would be roughly $3,400 per week, as is customary with them. US Foods is fully secured creditor through both its PMSI on goods delivered and its security interest in all of the Debtor's other assets. The Debtor believes neither US Foods nor creditors are prejudiced under this approach.

      g.    Secured Payments (Sa-Ro) – The Debtor seeks to continue making its monthly scheduled payments of close to $1,300 per month. Given that this was primarily an equipment leasing agreement, the Debtor does not believe Sa-Ro is prejudiced through these monthly payments (as they are the contractual amounts) or a diminution of their collateral (i.e.,

equipment and fixtures). At the end of the day, Sa-Ro still has personal guarantees and the equipment they delivered to secure the balance of any amounts owed.

       h.    Maintenance/Contingency – Built into the budget is a $5,000 margin for error. The $5,000 is expected to cover any unknown foreseen maintenance issues or possible deviations in the proposed budget.

### Final Approval of Use of Cash Collateral

19.    At the end of the day, the Debtor's proposed use of cash collateral on an interim basis will be the same as on a final basis, with the expectation of generating net cash to the estate through operations through the holiday season. Therefore, the Debtor seeks final approval of the proposed budget for the next 90 days on a final basis.

20.    The Debtor seeks under Rule 4001(b)(2) to schedule a Final Hearing at a time the Court deems proper. Pursuant to Rule 4001(b)(3), the Debtor seeks to have notice of the Final Hearing determined to be the mailing of copies of the signed Interim Cash Collateral Order to the Office of the United States Trustee, the Debtor's 20 largest unsecured creditors, and all known holders of pre-petition liens against the Debtor's property (as previously identified by the UCC search).

**WHEREFORE**, the Debtor prays that the Court enter its order:

1.    Granting this Motion on an interim basis;

2.    Authorizing the Debtor to use cash collateral on an interim basis the terms set forth in the budget;

3.    Setting a final hearing on the Motion;

4.    Authorizing service of the notice of the final hearing on the Motion as serving any signed Interim Cash Collateral Order to the Office of the United States Trustee, the Debtor's 20 largest unsecured creditors, and all known holders of pre-petition liens against the Debtor's property (as previously identified by the UCC search); and

5.    For such relief as the Court deems just and appropriate.

/ / /

Case: 15-31259   Doc# 6   Filed: 10/15/15   Entered: 10/15/15 14:45:02   Page 7 of 8

Dated:  October 15, 2015

LAW OFFICE OF IVAN C. JEN,
/s/ Ivan C. Jen
Ivan C. Jen
Proposed Counsel for the Debtor

MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING
USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363
AND (II) SCHEDULING A FINAL HEARING . . .