IVAN C. JEN (SBN 252885)
Law Office of Ivan C. Jen
5820 California Street
San Francisco, CA 94121
Telephone: (415) 504-2706
Facsimile: (415) 449-6110
Email: ivan@icjenlaw.com

Proposed Attorney for the Debtor

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>**Sinbad's Pier II, Inc.,**<br><br>Debtor. | Case No. 15-31259<br><br>Chapter 11<br><br>Judge:    Hon. Hannah L. Blumenstiel<br>Date:    [Subject to Order Setting Hearing]<br>Time:<br>Courtroom:    235 Pine Street, 23rd Floor San Francisco, CA 94104 |

### <u>DECLARATION OF DUANE STINSON IN SUPPORT OF FIRST DAY MOTIONS</u>

I, Duane Stinson, do hereby declare:

    I am the proposed responsible individual for Sinbad's Pier II, Inc., the debtor and debtor-in-possession in the above Chapter 11 case (the "<u>Debtor</u>" or "<u>Sinbad's</u>").  I am also the vice-president of the Debtor and assist in most of the day-to-day operations of the business.  As a result, I have personal knowledge of the matters stated herein except as to those matters stated on information and belief, and as to those matters, I am informed and believe them to be true.  If called as a witness, I could and would competently testify as to those facts.

    This Declaration is made in support of the MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363 AND (II) SCHEDULING A

Case: 15-31259   Doc# 8   Filed: 10/15/15   Entered: 10/15/15 14:50:08   Page 1 of 6

FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(b) and the MOTION FOR ORDER AUTHORIZING DEBTOR TO (I) CONTINUE CERTAIN CONSUMER PRACTICES AND (II) MAINTAIN ITS CREDIT CARD PAYMENT SYSTEM filed concurrently herewith.

**A.** **Litigation Background.**

1. The Debtor is a seafood restaurant that does business under the name of Sinbad's. Sinbad's has been operating at Pier 2 for over 40 years.

2. Sinbad's had a 20 year lease that ended in 2000. Since then, Sinbad's and the Port Authority, which is a subdivision of the City and County of San Francisco (the "Port Authority") have been unable to reach a new long term lease.

3. In March 2015, the Debtor filed a lawsuit against the Port Authority, alleging the Port Authority acted in bad faith in refusing to allow the Debtor to continue operations until such time as Pier 2 would be demolished, case CGC-15-544849 ("Bad Faith Case"). The Debtor sought declaratory relief[1] to prevent eviction until such time as the location would be needed under the Bay Area Water Emergency Transportation Authority ("WETA") project. The WETA project was delayed from 2015 to 2016. In this case, the Port Authority filed a cross-complaint for indemnity and added alter-ego claims against the Debtor's two directors, Thomas and Duane Stinson.

4. In April 2015, the Port Authority began unlawful detainer proceedings against the Debtor, case CUD-15-652204 (the "UD Case").

5. The UD Case went to trial prior to the Bad Faith Case, where a judgment was entered against the Debtor for possession and damages. The Sheriff's Department was prepared to take possession of Pier 2 on October 14, 2015. Consequently, the Debtor filed for relief under this chapter on October 14, 2015 to preserve the status quo and avoid mooting the Bad Faith Case.

**B.** **Operations and Financing.**

6. Sinbad's is a full scale restaurant operating out of Pier 2 that employs around 35 employees. As set forth in the Stinson Declaration, the Debtor estimates that it will be grossing

---

[1] The Debtor reserves its right to amend the complaint to add additional related causes of action and damages.

Case: 15-31259   Doc# 8   Filed: 10/15/15   Entered: 10/15/15 14:50:08   Page 2 of 6

around $145,000 for the next 30 day period. While portions of November will be slower due to Thanksgiving, business will pick up in December with the scheduling of various holiday events. Based on the Debtor's estimates, each subsequent 30 day period will generate at least $170,000. If the case continues through February, the Debtor would also be able to pick up business from both Valentine's Day and the Super Bowl. As projected, the Debtor estimates it could generate a net profit before taxes of at least $40,000. Furthermore, continuing operations would also allow the Debtor to continue employing employees through the holiday season.

7.      Attached as **Exhibit "A"** to this Declaration is the 90 day proposed budget for the use of cash collateral. The proposed payments and explanations under the budget are as follows:

a.      Rent – The Debtor intends to pay post-petition rent as the Port Authority would otherwise have an administrative rent claim. The daily rental charge is $730.78. The Debtor proposes to make weekly payments in arrears on Fridays, starting October 23 (first payment would be $6,577.02 for 10/14 through 10/22).

b.      Trade Vendors – The Debtor requires constant deliveries of fresh foods, beverages, and other perishables in order to maintain its bar and restaurant. These items in turn are sold and generate revenue for the Debtor. Vendors would be paid for their post-petition deliveries. The Debtor estimates total costs (excluding US Foods) at $21,000 on a monthly basis. Payment upon delivery is likely required as they are unlikely to deliver on estate credit. Because these items are quickly resold through the restaurant, continued payment of vendors as they deliver goods is essential to operations.

c.      Service Vendors – In addition to food, the Debtor has several vendors that are essential to operations. Linen service and janitorial service are required to keep appearances sanitary and clean. The total costs are about $3,500 a month. Separately, and perhaps most importantly, the Debtor needs its credit card processors. The Debtor's business is 90% credit cards. The processors take a percentage of sales and average about $5,000 per month, which is typically drawn at the beginning of the month. Disruptions in credit card processing could be fatal to such a credit-dependent business.

Case: 15-31259   Doc# 8   Filed: 10/15/15   Entered: 10/15/15 14:50:08   Page 3 of 6

d.    Utilities – Utility service includes water, garbage, electricity, and cable television.  The Debtor, but for the filing, is generally current on utilities.  All of them are necessary to operate the Debtor's business.  While it is unlikely the utilities will shut off the Debtor's utility service (in part due to section 366), maintaining utility service and paying for post-petition service is essential to business operations.

e.    Personnel (Payroll) – The Debtor employs around 35 employees.  The employees' wages have been prepaid through October 15.  After that, the Debtor needs to be able to make post-petition payments for employee wages.  Other than a complete cessation of business, the Debtor does not anticipate a reduction in its workforce.  Wages and related taxes are approximately $32,000 per month.  An additional $3,000 is paid each month for medical insurance as part of union agreements.  Separately, the Debtor has a bookkeeper (Faye Huang) whose role is to compile the daily receipts, invoices, and expenses.  Given the amount of paperwork involved in the business, her services are vital to assist in tracking expenses.  The bookkeeper receives two payments of $850 a month.  The Stinson brothers (Thomas, Duane, and Charles) manage the day-to-day operations and operate the front desk.  Each work about five to six days a week and each work about 50 hours weekly.  Compensation has been off-and-on, depending on the state of the business.  Otherwise, they generally receive $2,000 twice a month.  For purposes of this reorganization, they are prepared to reduce their payments to $1,000 for the first month to ensure profitability for the estate.  Afterwards, they are seeking $3,000 per month to cover the anticipated extra hours for the busier holiday season.

f.    Secured Payments (US Foods) – The Debtor seeks to pay roughly $13,000 per month to US Foods, which represents the amount of product that they deliver on a monthly basis.  Payments would be roughly $3,400 per week, as is customary with them.  US Foods is fully secured creditor through both its PMSI on goods delivered and its security interest in all of the Debtor's other assets.  The Debtor believes neither US Foods nor creditors are prejudiced under this approach.

g.    Secured Payments (Sa-Ro) – The Debtor seeks to continue making its monthly scheduled payments of close to $1,300 per month.  Given that this was primarily an

Case: 15-31259    Doc# 8    Filed: 10/15/15    Entered: 10/15/15 14:50:08    Page 4 of 6

equipment leasing agreement, the Debtor does not believe Sa-Ro is prejudiced through these monthly payments (as they are the contractual amounts) or a diminution of their collateral (i.e., equipment and fixtures). At the end of the day, Sa-Ro still has personal guarantees and the equipment they delivered to secure the balance of any amounts owed.

8.      h.      Maintenance/Contingency – Built into the budget is a $5,000 margin for error. The $5,000 is expected to cover any unknown foreseen maintenance issues or possible deviations in the proposed budget.

### C.      UCC Search Results.

9.      The Debtor did a UCC search for all liens against Sinbad's. Five current liens[2] under Sinbad's name turned up: the IRS, US Foods, Sa-Ro, Rhino Services, and Rewards Network.

10.      The IRS filed a tax lien in September 2015 for 2014 related taxes. The total amount is $71,522.18.

11.      US Foods, Inc. is one of Sinbad's major food suppliers. A UCC was filed on June 11, 2014, which includes a Purchase Money Security Interest in the goods they deliver as well as a general lien on the Debtor's other goods, inventory, equipment, fixtures, and their proceeds. The account is generally current under ordinary business practices. Sinbad's pays invoices about 30 days after they are due and runs an average balance of $14,000. Generally, a check for about $3,400 is paid each week as products are delivered.

12.      Sa-Ro Leasing, Inc. is an equipment financing company. In May 2014, Sa-Ro leased to the Debtor $38,000 worth of equipment and improvements. A UCC was filed on June 11, 2014, and the account is also personally guaranteed by both Thomas and Duane Stinson. Payment terms were $1,280.37 per month for 36 months. The account is current.

13.      Rhino Services had a UCC filing on September 4, 2012. The Debtor has no idea who they are. The Debtor's counsel called Rhino Services and left a message for more

---

[2] The Debtor borrowed funds from Can Collect, and the agreement provides for both a UCC lien and a personal guarantee. The Debtor's counsel spoke with Can Collect, who provided a UCC lien number. The Debtor found a UCC lien for Minglewood Services, which the Debtor assumes to be affiliated with Can Collect. The UCC filing was filed in February 2005, renewed in 2010, but not in 2015. It's my understanding that under California law, the filing has lapsed, and they no longer have a perfected security interest.

Case: 15-31259      Doc# 8      Filed: 10/15/15      Entered: 10/15/15 14:50:08      Page 5 of 6

information. From what counsel has learned, "Rhino Services" is an industrial and environmental cleaning contractor and are otherwise not involved with the Debtor. Under these circumstances, the Debtor is not providing for them under this cash collateral motion.

14.     Rewards Network Establishment Services Inc. ("Rewards Network") is a financing company. The Debtor's counsel contacted Rewards Network and confirmed with their analyst that this account appears to be closed, and, barring some unusual circumstances upon review, a UCC-3 release is being processed. Therefore, no treatment is being proposed for them.

**D.      Marketing and Credit Card Operations.**

15.     Sinbad's as part of its operations has occasionally participated in various marketing programs. In April 2015, Sinbad's participated in a GroupOn program where participants could pay $55.00 ("Face Value") to receive $110 in value ("Promotional Value"). Vouchers were to be used by June 2015. After that, the vouchers retained only its Face Value and not its Promotional Value. Approximately 150 vouchers remain unredeemed, for a face value of $8,250.

16.     As a retail establishment, Sinbad's estimates that 90% of all transactions occur by credit card. Sinbad's now has two credit card processors, American Express and Elavon. American Express processes its own cards while Elavon processes Visa, Mastercard, and Discover card transactions. Both processors remit funds on a daily basis and collect accrued fees at the beginning of the month through automatic EFTs.

17.     As contemplation of this filing, Sinbad's contacted the processors about whether they would accept cashier's checks for amounts due. Both of them would not accept deviations from the normal business process. Accumulated fees through October 13 are estimated at less than $1,000 for American Express and less than $2,000 for Elavon. This is less than the amounts typically held and remitted on a daily basis.

Executed on October 15, 2015 in the City and County of San Francisco, State of California.

/s/ Duane Stinson
Duane Stinson

DECLARATION OF DUANE STINSON IN SUPPORT OF FIRST DAY MOTIONS